JODI LINKER
Federal Public Defender
ELISSE LAROUCHE
Assistant Federal Public Defender
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:    415.436.7700
Facsimile:    415.436.7706
Elisse_larouche@fd.org

Counsel for Defendant NUNEZ

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 21-13 CRB |
| Plaintiff, | |
| v. | **DEFENDANT'S SENTENCING MEMORANDUM** |
| MARC NUNEZ, | **REDACTED** |
| Defendant. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. iv

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 2

I.     Mr. Nunez's excellent performance on pretrial release. ............................................. 2

II.    Mr. Nunez navigated poverty, dangerous neighborhoods, and a violent, drug-addicted father in childhood, but went on to obtain a college degree. ................................................ 3

ARGUMENT ..................................................................................................................... 5

I.     The offense conduct is serious and Mr. Nunez has taken responsibility for his conduct. ........... 5

II.    The applicable sentencing guidelines are unsupported by empirical data and provide an excessive starting point ......................................................................................... 6

III.   A probation sentence will best achieve the goals of 18 U.S.C. § 3553(a). ................................ 7

   A.    The nature and circumstances of the offense and Mr. Nunez's rehabilitation. ...................... 7

   B.    Mr. Nunez is not a threat to the community and treatment is key to rehabilitation and protection of the public. .......................................................................................... 8

   C.    Avoiding sentencing disparity. ............................................................................... 10

   D.    Seriousness of the offense, respect for the law and just punishment. ................................. 11

IV.    The defense's objections to the PSR. ........................................................................ 12

   A.    The unreliable allegations of physical and sexual abuse should not be considered and should be stricken from the PSR. ........................................................................................ 12

   B.    The government has not met its burden to show the disputed video is of a minor and the offense level should be 20, not 21. ............................................................................ 15

C.      The defense continues to object to inclusion of information in the PSR of non-criminal conduct and the suggestion of other child pornography material. .................................................... 16

V.      This Court should not impose special assessments under the JVTA. ....................................... 16

VI.     Objections to supervised release conditions.............................................................................. 17

A.      Proposed conditions 7 and 9: The no computer condition and no access to internet or any "on-line computer service" ........................................................................................................ 17

B.      Proposed condition 13: No adult sexually explicit conduct condition as defined at 18 U.S.C. § 2256(2) ................................................................................................................................ 19

C.      Proposed condition 14: Ban from 100 feet of any location where children are likely to gather or contact with children. .............................................................................................................. 20

D.      Proposed condition 22: Abstain from use of alcoholic beverages.......................................... 21

CONCLUSION ....................................................................................................................... 21

1

# TABLE OF AUTHORITIES

2

**Federal Cases**

3

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte,*
4
    481 U.S. 537 (1987) ........................................................................... 19-20

5

*Gall v. United States,*
    552 U.S. 38 (2007) ............................................................................... *passim*
6

*Gibson v. Fla. Legis. Investigation Comm.,*
7
    372 U.S. 539 (1963) ................................................................................ 20

8

*Kimbrough v. United States,*
    552 U.S. 85 (2007) ................................................................................... 6
9

*Packingham v. North Carolina,*
10
    137 S. Ct. 1730–36 (2017) ..................................................................... 17-18

11

*United States v. Apodaca,*
    641 F.3d 1077 (9th Cir. 2011) ................................................................. 20
12

13
*United States v. Autery,*
    555 F.3d 864 (9th Cir. 2009) .................................................................. 10

14

*United States v. Carty,*
15
    520 F.3d 984 (9th Cir. 2008) (en banc) .................................................... 5

16
*United States v. Crume,*
    422 F.3d 728 (8th Cir. 2005) ................................................................... 18

17

*United States v. Del Valle-Cruz,*
18
    785 F.3d 48–64 (1st Cir. 2015) ............................................................... 20

19
*United States v. Ellis,*
    984 F.3d 1092 (4th Cir. 2021) ................................................................. 18
20

*United States v. Evans,*
21
    883 F.3d 1154 (9th Cir. 2018) ................................................................. 17

22
*United States v. Freeman,*
    316 F.3d 386–92 (3d Cir. 2003) .............................................................. 18
23

*United States v. Garcia,*
24
    340 F.3d 1013 (9th Cir. 2003) ................................................................... 9

25
*United States v. Gnirke,*
    775 F.3d 1155 (9th Cir. 2015) ................................................................. 19
26

*United States v. Henderson,*
27
    649 F.3d 995 (9th Cir. 2011) ........................................................... 6, 7, 10

28

*United States v. Holena,*
   906 F.3d 288 (3d Cir. 2018) ............................................................................ 18

*United States v. Holm,*
   326 F.3d 872–78 (7th Cir. 2003) ...................................................................... 18

*United States v. LaCoste,*
   821 F.3d 1187 (9th Cir. 2016) ................................................................... 17, 18

*United States v. Mercado,*
   777 F.3d 532–39 (1st Cir. 2015) ...................................................................... 20

*United States v. Parish,*
   308 F.3d 1025 (9th Cir. 2002) ...................................................................... 8, 9

*United States v. R.V.,*
   157 F. Supp. 3d 207 (E.D.N.Y. 2016) ............................................................ 10

*United States v. Rearden,*
   349 F.3d 608 (9th Cir. 2003) ........................................................................... 19

*United States v. Romero-Rendon,*
   220 F.3d 1159 (9th Cir. 2000) ......................................................................... 15

*United States v. Sofsky,*
   287 F.3d 122–27 (2d Cir. 2002) ...................................................................... 18

*United States v. Soltero,*
   510 F.3d 858 (9th Cir. 2007) ........................................................................... 20

*United States v. Vasquez,*
   160 F.3d 1237 (9th Cir. 1998) ......................................................................... 12

*United States v. Wolf Child,*
   699 F.3d 1082 (9th Cir. 2012) ..................................................... 17, 18, 19, 20

**Federal Statutes**

18 U.S.C. § 2252 ...................................................................................................... 1

18 U.S.C. § 2256 ............................................................................................... 18, 19

18 U.S.C. § 3013 .................................................................................................... 16

18 U.S.C. § 3014 .................................................................................................... 16

18 U.S.C. § 3553 ............................................................................................ *passim*

18 U.S.C. § 3565 .................................................................................................... 12

18 U.S.C. § 3583 ........................................................................................ 17, 19, 21

18 U.S.C. § 3661 .................................................................................................... 15

18 U.S.C. § 4247 .............................................................................................. 12, 13

**State Cases**

*State v. Brown*,
    902 S.W. 2d 278 (Mo. 1995) ........................................................................................... 14

**INTRODUCTION**

After over two years of successful performance on pretrial release, Marc Nunez is before the Court for sentencing after pleading guilty, pursuant to a plea agreement, to possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2). Mr. Nunez respectfully requests a sentence of five years of probation, a special assessment, and a lengthy term of supervised release with specialized conditions that achieve the goals of the Sentencing Reform Act. This sentence is "sufficient, but not greater than necessary" to achieve the purposes of sentencing that are set forth in 18 U.S.C. § 3553(a).

This is Mr. Nunez's first offense. For the first time, he is receiving mental health treatment related to being a victim of rape, being bullied for being gay, and his struggles growing up poor and with a drug-addicted father. Unlike most child pornography cases, Mr. Nunez possessed relatively few images and the images he did possess were not of young children.

Per the parties' plea agreement, the applicable offense level is either 20 or 21, depending on the Court's resolution of one disputed video that would increase the image number and related enhancement. Mr. Nunez is in Criminal History Category I and the plea agreement results in a guideline range of either 33-41 or 37-46. For the reasons discussed, the defense contends the applicable offense level is 20 and the range is 33-41 months.

The defense continues to object to the Presentence Report's extremely prejudicial inclusion of allegations by a ten-year-old that Mr. Nunez, an afterschool teacher at the time, physically and sexually abused him. The defense and the government have objected to the inclusion of these allegations and the government takes the position that it cannot prove the allegations. The implications of these allegations cannot be understated. Citing to the allegations, probation recommends a high-end guideline sentence of 46 months. If the allegations are to remain in the PSR they will affect Mr. Nunez's Bureau of Prison's dangerousness assessment. They also provide a basis for Mr. Nunez to be civilly committed pursuant to the Adam Welsch Act. The lack of reliability against the extreme repercussions, weigh in favor of striking the allegations from the PSR.

Mr. Nunez has done a tremendous amount of work to achieve stability, despite continuing struggles he has faced, and for the reasons set forth below, it is clear that there is no goal of sentencing that would be achieved by a custodial sentence.

## BACKGROUND

### I.   Mr. Nunez's excellent performance on pretrial release.

Mr. Nunez is a 29-year-old first generation Latino immigrant who was born near Stockton, California and later raised in Salinas. PSR ¶¶ 72, 74, 78. This is his first conviction and only arrest. *See* PSR ¶¶ 66-70. Mr. Nunez was arrested in this case on December 4, 2020 and released three days later. While Mr. Nunez was found in possession of child pornography, the messages at issue in this case took place in 2018 and 2019. *See* PSR ¶ 51.

Mr. Nunez has been on pretrial supervision for over two years and, according to pretrial services, has complied with all release conditions including participating in treatment services. PSR ¶ 5. This case has led to Mr. Nunez receiving mental health treatment for the first time in his life. PSR ¶ 90. He has been engaged in treatment, which has given him helpful and necessary insight into his prior criminal conduct. Mr. Nunez believes treatment would be beneficial in the future to work through his prior experiences of witnessing drug abuse and domestic violence growing up and of being raped in college. *See id.* As a juvenile, Mr. Nunez had sex with adult men, a behavior that was somewhat normalized for him and that he's had to readdress through therapy and this case. PSR ¶ 93.

During his two years of pretrial release, Mr. Nunez has positively contributed to the community. Since August 2021, Mr. Nunez has been a full-time supervisor at Total Wine & More in Daly City and was recently promoted to assistant manager, pending a background check. PSR ¶ 104. Mr. Nunez also has a strong employment history working at a school and in various retail positions. PSR ¶¶ 106-107. Mr. Nunez also remains ambitious and he has a bright future ahead of him. He hopes to remain employed and eventually return to school to obtain a master's degree. PSR ¶ 84.

Critical in any criminal case, but especially in child pornography cases where isolation and depression can lead to problematic and criminal behavior, Mr. Nunez's family and friends are aware of his offense and fully support him. His sisters, who have minor children, trust their brother and note

he's a great uncle and brother. PSR ¶ 86. They have no concerns about their brother posing a danger to the children, despite the current offense. *Id.* Mr. Nunez also has numerous family and friends who submitted letters of their support for him. Declaration of Elisse Larouche ("Larouche Decl.") ¶ 2, Ex. A. Sadly, Mr. Nunez lost his mother, with whom he was very close, to kidney cancer recently in September 2022. PSR ¶ 72. Because of the loss of his mother, Mr. Nunez's connection to positive social networks and family, and his ability to access therapy to work through his grief will be even more critical.

Not only has Mr. Nunez shown he can be a stable, gainfully employed member of society, he has also shown that he can weather stress, loss, and challenges while not reverting to criminal behavior. His engagement with treatment is the beginning of utilizing mindfulness and helpful tools to process his emotions. The only issue, unfortunately, has been that Mr. Nunez's clinician has changed numerous times, making it challenging to develop a deeper connection and rapport. With sustained and specialized treatment and, continued oversight through conditions of supervised release, it is clear that Mr. Nunez will continue to show his ability to make lawful choices in life.

## II.   Mr. Nunez navigated poverty, dangerous neighborhoods, and a violent, drug-addicted father in childhood, but went on to obtain a college degree.

Growing up, Mr. Nunez struggled with poverty, a drug-addicted, violent father, bullying due to being openly gay, and gang violence in his neighborhoods. PSR ¶¶ 74-78. Mr. Nunez's hardworking and loving mother and his siblings helped carry him through those difficult times. His mother maintained a job at a grocery store and while money was always tight for the family, his mother found a way to make it work to support her five children. PSR ¶ 74. Mr. Nunez's father was addicted to drugs, specifically heroin. PSR ¶ 76. He would often miss work, disappear, and he did not financially or otherwise support the family. PSR ¶ 74, 76. Because of his father's absence and his mother constantly working, Mr. Nunez's older siblings often cared for him and he cared for his younger siblings. PSR ¶ 74. When Mr. Nunez was around twelve years old, his mother moved the family to Salinas. PSR ¶ 78. There, he and his siblings lived in a friend's garage. *Id.* All the children shared one converted room in the garage and used the kitchen and bathroom in the main house. *Id.* Mr. Nunez was embarrassed by this situation; he never wanted to have friends over or describe where he lived. *Id.*

Mr. Nunez has never had a close relationship with his father who he witnessed be physically and verbally violent toward his mother, cheat on his mother, and knew to be using drugs and absent from the family. PSR ¶¶ 76, 77. In just fifth grade, Mr. Nunez had to intervene and pull his father off his mother when his father had her pinned against the wall. PSR ¶ 77. He recalls his parents constantly arguing, he was told his father pointed a gun at his mother, and he was with his father when he was cheating on his mother. PSR ¶¶ 76, 77. When he was 12 years old, his parents divorced. PSR ¶ 78.

In both Stockton and Salinas, Mr. Nunez lived in dangerous neighborhoods where he feared for his safety. Playing outside was not safe. PSR ¶ 74. It was not uncommon for dead bodies to be found in nearby dumpsters. PSR ¶ 78. Gangs in Salinas were prevalent. They tried to recruit Mr. Nunez. *Id*. He successfully avoided them, knowing the dangerous and criminal life that would lead to. *Id*.

Mr. Nunez also faced perils at school. He was bullied for being openly gay. PSR ¶ 79. He had friends and teachers that tried to protect him, but bullying was a constant for him. *Id*. Because of his family's financial insecurity, he attended five different elementary schools. PSR ¶ 103. Mr. Nunez was placed in special needs courses in elementary school because of limited verbal skills, likely due to a developed shy and reserved nature from moving schools so frequently. *Id*. Later, Mr. Nunez still found happiness in school, enjoying his classes and extracurricular activities, including drumline and band. PSR ¶ 79.

Despite the challenges Mr. Nunez navigated in his youth, he graduated from high school and went on to obtain a Bachelor of Science in Psychology from San Francisco State University in 2016. PSR ¶ 102. But college also presented a traumatic experience. In the first few months, Mr. Nunez was raped by a man 10 years older than him. PSR ¶ 80. He asked the man to stop but he continued to rape him. *Id*. In shock after this incident, Mr. Nunez did not know what to do. *Id.* He kept his victimization to himself and did not report it. *Id*. Mr. Nunez only recently disclosed his experience as a victim of rape and through this case, started engaging in counseling. *Id*.

In college, Mr. Nunez began to drink heavily and, at 25 years old, he started using cocaine. PSR ¶¶ 95, 97. His cocaine and alcohol use contributed to the present offense. PSR ¶ 99. He would use to excess and make bad decisions, not processing through the consequences. *Id*. After seeing the effects

of his use, especially through this case, he quit cold turkey. *Id.* Mr. Nunez has had no positive drug tests or other substance issues while on pretrial release. PSR ¶ 5.

**ARGUMENT**

While "[a]ll sentencing proceedings are to begin by determining the applicable Guidelines range," the sentencing court may not presume that the Guidelines range is reasonable. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (citation omitted). The Guidelines are but "one factor among the § 3553(a) factors that are to be taken into account," and the "overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary'" to achieve the goals of 18 U.S.C. § 3553(a). *Id.* In Mr. Nunez's case, a sentence of probation will achieve those goals.

**I.      The offense conduct is serious and Mr. Nunez has taken responsibility for his conduct.**

Mr. Nunez's conduct is undoubtedly serious. He showed an inclination toward underage teenage males. While Mr. Nunez never created material, Mr. Block did send him a video of Mr. Block engaging in sexual activity with a teenage male. Mr. Nunez admitted to possessing the images at issue in this case, which were of underage males. Mr. Nunez also chatted with males on Grindr who stated they were 18 years old initially, but later revealed they were not yet 18. While Mr. Nunez himself had sex with adult men when he was a teenager, he realized even if it was normalized to him by men when he was a teen, the conduct is unlawful. During his post-arrest interview, Mr. Nunez disclosed his conduct to agents. *See* PSR ¶¶ 16-21. Mr. Nunez has taken full responsibility for his conduct of possessing images of child pornography.

There are notable aspects of this case, however that suggest lesser criminality. First, this is relatively low-image number case. Without the disputed video, Mr. Nunez had 150-299 images, and with the video that constitutes 75 images, he enters the higher four-level enhancement bracket for 300-599 images. PSR ¶ 3. In contrast, defendants in over 77% of cases in fiscal year 2019 received the five-level enhancement for having 600 or more images.[1] The median number of images for non-

---

[1] *Federal Sentencing of Child Pornography, Non Production Offenses* ("Federal Sentencing of Child Pornography"), United States Sentencing Commission, June 2021, at p. 4, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf

*US v. Nunez,* Case No. 21-13 CRB;
Def's Sentencing Memo.                                    5

production offenses like the present case was 4,265.[2] Second, Mr. Nunez's interest was in teenagers, not children. In 2019, over half of non-production offenses included images of infants or toddlers, over 78% involved images showing sadistic or masochistic conduct or abuse of an infant or toddler, and 99% of offenses included prepubescent victims.[3] *None* of these enhancements related to young children apply here. *See* PSR ¶¶ 53-63. Third, Mr. Nunez's conduct is more consistent with unlawful indifference toward legal age. As revealed in Mr. Nunez's messages, he often spoke to individuals on Grindr – a platform where the user verifies that he is 18 years or old – only to later find out those individuals were not 18 years old. Mr. Nunez takes responsibility for not terminating those conversations at that time, encouraging correspondence with the minors, and noting his attraction to teenagers. He has gained meaningful insight to appreciate the wrongfulness and unlawful nature of his actions. He will not engage in such conduct again. However, Mr. Nunez's behavior is in marked contrast with many child pornography offenders who go online specifically seeking violent images of young children. Many of the individuals Mr. Nunez interacted with were willing, sexually curious, albeit of an unlawful age, teenagers. Mr. Nunez does not have a predilection for children and can control his sexual behavior to age-appropriate individuals.

## II.     The applicable sentencing guidelines are unsupported by empirical data and provide an excessive starting point

As the Court is well-aware, the child pornography Guidelines have been the subject of widespread criticism, not only from the courts but also from the Sentencing Commission. *See generally United States v. Henderson*, 649 F.3d 995 (9th Cir. 2011). Ordinarily, the Sentencing Guidelines are entitled to deference because they are the product of years of careful empirical study. *See Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007). But "not all of the Guidelines are tied to this empirical evidence." *Gall v. United States*, 552 U.S. 38, 46 n.2 (2007). When the Guidelines do not "exemplify the Commission's exercise of its characteristic institutional role," they are more likely to "yield[] a sentence 'greater than necessary' to achieve § 3553(a)'s purposes even in a minerun case." *Kimbrough*, 552 U.S. at 109-10. Section 2G2.2 has been modified at least nine times by

---

[2] *Id*.
[3] *Id*.

Congressional fiat – usually over the objection of the Sentencing Commission. *See Henderson*, 649

F.3d at 960-962; *see also* U.S. Sentencing Comm'n, *Fifteen Years of Sentencing: An Assessment of

How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 72-73

(2004)[4] (observing that, "[m]uch like the policymaking in the area of drug trafficking, Congress has

used a mix of mandatory minimum penalty increases and directives to the Commission to change

sentencing policy for sex offenses"). The result is an "anomalous" Guideline, whose uncritical

application can lead to "unjust and sometimes bizarre results." *Henderson*, 649 F.3d at 964 (Berzon, J.,

concurring).

Here, Mr. Nunez's base offense level is 18, a two-level enhancement is assessed for using a

computer or other electronic device to view the images, and a three or four-level enhancement will

apply based on the number of images. PSR ¶ 55. Probation calculates Mr. Nunez's final offense level,

after acceptance of responsibility, at 21 for a sentencing guideline range of 37-46 months. PSR ¶ 63,

Recommendation. "Because of the history of Congressional involvement, the base offense level for

possession of child pornography is already a relatively high 18 (compared to 10 for the same offense

in 1991)." *Id*. at 965. Moreover, the enhancements for the use of a computer and large number of

images apply in a majority of cases, resulting in a de facto higher effective base offense level. In fiscal

year 2019, §2G2.2(b)(6) use of a computer two-level enhancement applied in over 95% of non-

production cases and the five-level enhancement for 600 images or more applied in over 77% of

cases.[5] These indiscriminate enhancements, inevitable given the widespread use of technology and

videos available stand "in significant tension with a sentencing judge's duties 'to consider every

convicted person as an individual.'" *Id*. (quoting *Gall*, 552 U.S. at 52).

**III.   A probation sentence will best achieve the goals of 18 U.S.C. § 3553(a).**

**A.  The nature and circumstances of the offense and Mr. Nunez's rehabilitation.**

Here, Mr. Nunez admitted to possessing child pornography. He did not distribute or produce it.

He did not gain financially or otherwise from this possession. His crime was possessing and viewing

the unlawful images. While Mr. Nunez did interact with underage individuals, these were individuals

---

[4] ://efaidnbmnnnibpcajpcglclefindmkaj/https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf
[5] Federal Sentencing of Child Pornography at 4.

*US v. Nunez*, Case No. 21-13 CRB;
Def's Sentencing Memo.                                                            7

he encountered through a forum where the individuals represented they were 18 years old and told Mr. Nunez such initially. He did not go to an illegal website to prey on children. Nonetheless, Mr. Nunez understands his conduct was very serious and he has fully accepted responsibility.

Mr. Nunez has proven that he has taken major strides in his rehabilitation. He has taken treatment seriously and performed exceptionally well on pretrial release. He is a contributing member of society through his work, support of his family, solid work history, education, and strong friendships. He cared for his ailing mother in her final moments in 2022. These characteristics alone merit a substantial variance and the Court can trust he will continue to be an asset to the community.

### B. Mr. Nunez is not a threat to the community and treatment is key to rehabilitation and protection of the public.

In determining the appropriate sentence, this Court must consider the sentencing goals of deterrence, protection of the public, and providing Mr. Nunez with needed correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Mental health treatment and pretrial conditions have been key to Mr. Nunez's success on over two years of release. He had never before been evaluated for a mental health condition or sought treatment. PSR ¶ 90. He is finally addressing the root of his criminal conduct and has benefitted from the weekly individual HOPE program counseling received because of this case. PSR ¶ 91. Mr. Nunez plans to continue receiving mental health counseling to assure that he will not reoffend. *Id*. In addition, Mr. Nunez has graduated college, has aspirations for future schooling, and engages in pro-social activities including his stable employment and relationships with family.

Mr. Nunez is only 29 years old and has many more years in our community and society. The best way to ensure his continued, productive integration is to allow just that – monitored and heavily supervised integration. A prison sentence would mean a pause on his treatment, possibly less treatment or lesser quality of treatment, and exposure to antisocial behavior and peers rather than prosocial ones.

Further, Mr. Nunez will be vulnerable in prison, especially given his history as a survivor of rape. In prison, he is likely to withdrawal and distance himself from others, which is counterproductive to working through his prior traumatic experiences and rehabilitation. "A defendant's unusual susceptibility to abuse by other inmates while in prison may warrant a downward departure." *United*

*States v. Parish*, 308 F.3d 1025, 1031 (9th Cir. 2002) (citing *Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035) (1996)). In *Parish*, the district court found that the defendant "was susceptible to abuse in prison because of a "combination" of factors: "his stature, his demeanor, his naivete, [and] the nature of the offense." 308 F.3d at 1031-1032. *See also United States v. Garcia*, 340 F.3d 1013, 1020 (9th Cir. 2003) (in the context of release pending appeal, discussing whether "incarceration would impose exceptional risks on a defendant involving his physical or mental well-being-risks that might arise as a result of the nature of his crime or even as a result of his possessing certain physical, psychological, or other characteristics."). In its 2001 report on male rape in prison, Human Rights Watch revealed a broad range of factors that correlate with increased vulnerability to rape. "Specifically, prisoners fitting any part of the following description are more likely to be targeted: young, small in size, physically weak, white, gay, first offender, possessing "feminine" characteristics such as long hair or a high voice; being unassertive, unaggressive, shy, intellectual, not street-smart, or "passive"; or having been convicted of a sexual offense against a minor." Prisoners with any one of these characteristics typically face an increased risk of sexual abuse, while prisoners with several overlapping characteristics are much more likely than other prisoners to be targeted for abuse.[6]

Mr. Nunez is not a large individual – he is 125 pounds and 5'8. He is shy, quiet, unaggressive, and displays effeminate behaviors. He is gay. He is a first-time offender convicted of possession of child pornography. He is also a survivor of rape. Taken together, he will be extremely vulnerable if he is sentenced to prison.

Along with treatment, risk management and intensive supervision strategies can be implemented that will ensure Mr. Nunez is not a danger to the community. Mr. Nunez will have mental health and sex offender treatment, his access to devices will be limited and monitored, he will have polygraph interviews, he will have frequent meetings with probation, and will continue to be engaged in prosocial activities and relationships. In sum, the best and most necessary treatment for Mr. Nunez is available out of custody and custody may actually hinder, not help, rehabilitation.

---

[6] *No Escape, Male Rape in U.S.* Prisons, Human Rights Watch, Legacy Reports, http://www.hrw.org/legacy/reports/2001/prison/report4.html#

### C.  Avoiding sentencing disparity.

Section 3553(a)(6) requires a court to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." *See Gall*, 552 U.S. at 56. Here, Mr. Nunez is a first-time offender guilty of possession of child pornography.

Judge Weinstein of the Eastern District of New York has explained that there are varying degrees of culpability among child pornography offenders and that the current sentencing framework has largely failed to distinguish among child pornography offenders with differing levels of culpability and danger to the community. The applicable structure does not adequately balance the need to protect the public, and juveniles in particular, against the need to avoid excessive punishment, with resulting unnecessary cost to defendants' families and the community, and the needless destruction of defendants' lives. *United States v. R.V.,* 157 F. Supp. 3d 207, 209 (E.D.N.Y. 2016) (explaining the appropriateness of a non-incarceratory sentence with seven years of supervised release, for a defendant whose guidelines range was 78 to 97 months, and noting the comparatively lower culpability of defendants convicted of possessing child pornography); *see also Henderson*, 649 F.3d at 955 (discussing that the child pornography guidelines are not based on empirical data, but rather on frequent legislation); *United States v. Autery*, 555 F.3d 864 (9th Cir. 2009) (upholding a probationary sentence of five years, with conditions, for a defendant convicted of child pornography possession with a stable lifestyle and supportive family).

Because courts have recognized that the child pornography guidelines are inflated, unsupported by data, and overly punitive, in fiscal year 2019, 66% of child pornography sentences were below the guidelines due to downward variances or departures.[7] Trends from 2005 to 2019 also show consistent downward departures in sentences.[8]

The probation sentence requested in this case is not anomalous. Courts in this district have sentenced defendants with high child pornography guideline ranges to probation or relatively low custodial sentences.

- *United States v. Chen*, 20-CR-84-EMC (N.D. Cal 2021) – defendant convicted of possession of child pornography and sentenced to five years' probation with six months home detention at a residential reentry center with location monitoring with Guideline range of 51–63

---

[7] Federal Sentencing of Child Pornography at 23, Figure 9.
[8] *Id*. at 24, Figure 10.

months. Defendant possessed approximately 60 videos and 4,600 images of child pornography, including images of children as young as seven.

- *United States v. Kainne*, 14-CR-218-CRB (N.D. Cal 2017) – defendant convicted of possession of child pornography and sentenced to five years' probation with six months home confinement with a curfew, where plea agreement calculated Guideline range of 51-63 months and PSR calculated range of 78–97 months.

- *United States v. Banducci*, 18- CR-531-SI (N.D. Cal. 2019) – defendant convicted of possession of child pornography sentenced to 12 months and one day custody, with Guidelines range of 78–97 months.

- *United States v. Connell*, 18-CR-281-RS (N.D. Cal. 2019) – defendant convicted of possession of child pornography sentenced to 12 months and one day, with government-calculated Guidelines range of 51–63 months.

- *United States v. Brockhaus*, 17-CR-40-RS (N.D. Cal. 2019) – defendant convicted of receipt of child pornography sentenced to 24 months, with CHC III and Guidelines range of 121–151 months.

Courts in other districts have made similar sentencing determinations, including:

- *United States v. DeRoche*, 2:19-CR-197-RSL (W.D. Wa. 2021) – time served with five years' of supervised release on mental health, substance abuse and sex offender treatment conditions, after successful pretrial treatment efforts. Defendant had over 60,000 files depicting child rape and sexual abuse. Guideline range 78–97 months.

- *United States v. Danos*, 6:19-CR-282-RRS-PJH (W.D. La. 2021) – time served with ten years' supervised release for 19-year old, based on youth, difficult childhood and post-offense rehabilitation. Charged with two counts of receipt and one count of possession. Guideline range 97–121 months.

- *United States v. Hawkins*, 4:18-CR-6007 (E.D. Wa. 2020) – no time, 15 years supervised release for man with over 12,000 images and 2,400 videos, Asperger's Syndrome, subject to bullying, who evidenced no difficulties during extended period of pretrial release.

A more fulsome list of comparative sentences is included as Exhibit B. Larouche Decl. ¶ 3.

**D.  Seriousness of the offense, respect for the law and just punishment.**

The Supreme Court has warned "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54 (quotations omitted). Rather than imposing a 46-month sentence to be followed by fifteen years of supervised release as recommended by the probation office, Mr. Nunez asks this Court to place him on probation for a period of five years, with conditions that reflect the goals of § 3553(a). As the Supreme

Court has noted, probation, is not "an act of leniency" but "a substantial restriction of freedom." *Gall*, 552 U.S. at 44. Moreover, a sentence of probation provides the Court with strong tools to punish Mr. Nunez if he violates any of the probation conditions. Under 18 U.S.C. § 3565(a)(2), when a defendant violates a condition of probation, the Court may revoke probation and resentence the defendant anew on the underlying criminal charge, including to a term of imprisonment followed by supervised release. *See United States v. Vasquez*, 160 F.3d 1237, 1238 (9th Cir. 1998).

In addition to probation, Mr. Nunez has and will continue to be punished collaterally for his offense. He will have *lifetime registration as a sex offender*. This information will be available for the public to see, causing further shame and ostracizing him from society. Mr. Nunez has already lost his prior employment and his future employment will be restricted not just because of his criminal conviction, but the nature of the conviction that has the greatest social stigma. His housing and other opportunities may also be restricted. Here, where Mr. Nunez poses minimal risk to the community, has already achieved significant rehabilitation, and is a good candidate for intensive therapy and full recovery, he should be placed on probation, as this best satisfies the goals of sentencing.

## IV. The defense's objections to the PSR.

### A. The unreliable allegations of physical and sexual abuse should not be considered and should be stricken from the PSR.

The defense maintains its objection to the PSR's inclusion of inflammatory and unreliable allegations that Mr. Nunez physically and sexually assaulted a student at the school where Mr. Nunez was previously an afterschool teacher and to the newly added victim impact statement. (PSR ¶¶ 35-45, 48, 138; PSR Objection Numbers 5 and 6; PSR Justification). The government does not believe it could prove the allegations, strongly suggesting the information should not be included as unreliable. If the Court is inclined to rely on these allegations in any manner, the defense requests an evidentiary hearing.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████





Finally, an overarching concern is the general questionable veracity of claims made by children. Literature on the subject is vast and the defense would be happy to submit more fulsome briefing at the Court's request. In short, young children are more subject to suggestibility and because their cognitive abilities are still developing, there are additional concerns of competency to testify and relate information. *See* Stephen J. Ceci & Richard D. Friedman, *The Suggestibility of* Children*: Scientific Research and Legal Implications*, 86 CORNELL L. REV. 33, 34-39 (2000) (describing the disagreement in the field of psychology between the mainstream view of child witnesses as highly suggestible and the challenge to this view); Robert H. Pantell and AAP Committee on Psychosocial Aspects of Child and Family Health, *The Child Witness in the Courtroom*, Pediatrics, Vol. 139, no. 3 p. 2, Mar. 2017 (citing experimental study showing that young children can be induced to recall events that did not occur). Many courts have recognized issues with child witnesses and implemented safeguards. *See, e.g.*, CALCRIM 330 (specific jury instruction regarding testimony of children ten years or younger that direct the jury to consider the child's age and cognitive development); *State v. Brown*, 902 S.W. 2d 278 (Mo. 1995) (state statute creates a rebuttable presumption that children under age of ten are incompetent to testify and setting forth factors to consider competency).

███████████████████████████████████████████████████

████████████████████████████████████████

Probation cites to 18 U.S.C § 3661 and USSG § 1B1.4 for the proposition that there is no limitation on information for the court's consideration. However, there should be a limit for *reliable* information otherwise it is not evidence of the defendant's character or conduct and any allegation against the defendant, however unsubstantiated, could be used against him. Probation Monograph 107, Section 320 Standard of Proof states that the probation officer must carefully evaluate any allegation about the defendant, "particularly when such information cannot be independently verified." "[I]nformation should have a sufficient indicia of reliability to support its probable accuracy." *See also* USSG § 6A1.3. Per Monograph 107, the absence of corroborating information must be considered.

Given the extreme nature of the allegations and the lack of corroborating information, it is clear that the allegations here are not reliable. The Court should not rely on the allegations in any way and they should be stricken given their serious implications.

**B. The government has not met its burden to show the disputed video is of a minor and the offense level should be 20, not 21.**

The only dispute regarding the applicable offense level is the age of the individual depicted in one video and in the PSR at paragraphs 23(c) and 24. Without the video, there is a three-level enhancement for 150-299 images versus a four-level enhancement for 300-599 images.

It is the government's burden to prove any sentencing enhancement that increases the offense level and they have failed to do so. *United States v. Romero-Rendon*, 220 F.3d 1159, 1160-61 (9th Cir. 2000). In the video at issue, an individual is anally sodomizing himself with what appears to be a plastic vial or tube. The government's report asserts the individual therein is ten to fifteen years old but provides no explanation for its conclusion. Undersigned counsel has viewed the video, which is zoomed in on the individual's bottom and anus, so no facial or other features that might be indicative of age are visible. Probation contends the individual in the video is eight to twelve years old but the reasoning for its conclusion is unsupported by evidence or any other reasonable basis. Probation relies on the "individual's body size, hand and finger size," but without a reference point for size other than the glass tube and because of the zoomed in nature of the video, perceived size cannot determine age

of the individual. Probation also states that there is no visible hair around the anus, but certain individuals may not have hair there or some choose to remove it. Finally, probation states the tube was large compared to the buttocks. Again, there is no reference point and that the tube may have been large compared to the buttocks, without any idea of the actual size of the tube, does not establish age of the individual. The age of the individual in the video cannot be ascertained and the Court should not include it in the calculation of images.

### C. The defense continues to object to inclusion of information in the PSR of non-criminal conduct and the suggestion of other child pornography material.

Throughout the PSR, the report includes extraneous information that the probation officer uses to suggest greater criminality or concerning, suspicious behavior. For example, there are several images or videos of "age difficult" pornography that the probation officer says would constitute child pornography if children. The probation officer also includes a description of a photo with Mr. Nunez and his students for the first day of school. Without any further evidence, this information is not criminal and it creates a cumulative prejudicial effect for Mr. Nunez. Accordingly, the defense maintains its objections 2, 3, 4 (regarding PSR ¶¶ 25(5), 28, 34).

The defense also objects to the sentence in the Justification section that states Mr. Block and Mr. Nunez traded child pornography images. Mr. Block sent Mr. Nunez images, but Mr. Nunez did not send them.

### V.    This Court should not impose a special assessment under the JVTA.

Contrary to the PSR's assessment, Mr. Nunez is not subject to the Justice for Victims of Trafficking Act ("JVTA") of 2015's $5,000 assessment nor should Mr. Nunez be subject to any other fine. Under the JVTA, 18 U.S.C. § 3014(a), only a "non-indigent person" convicted of possession of child pornography is subject to a $5,000 special assessment. The qualifier of "non-indigent person" distinguishes this special assessment from the general special assessment statute, 18 U.S.C. § 3013(a)(2)(A), which mandates a $100 special assessment on all defendants. "Indigent" is a legal term of art, meaning "someone who is too poor to hire a lawyer and who, upon indictment, becomes eligible to receive aid from a court-appointed attorney and a waiver of court costs." *See* "Indigent Defendant," *Black's Law Dictionary* (10th Ed. 2014).

1

## VI.     Objections to supervised release conditions.

2        The government bears the burden of establishing the necessity of any condition of supervised

3    release. *United States v. Wolf Child*, 699 F.3d 1082, 1090 (9th Cir. 2012).

4              **A.  Proposed conditions 7 and 9: The no computer condition and no access to**

5                   **internet or any "on-line computer service"**

6        Mr. Nunez objects to proposed conditions 7 and 9 which restrict possession of a computer

7    without prior approval and internet access or any "on-line computer service" at any location (including

8    employment) without prior approval from the probation officer. The conditions are substantively

9    unreasonable because while related to the goals of deterrence and protection of the public, they are

10   overbroad and "infringe[] more on [Mr. Nunez's] liberty than is reasonably necessary to accomplish

11   these statutory goals." *United States v. Evans*, 883 F.3d 1154, 1161 (9th Cir. 2018), cert. denied, 139

12   S. Ct. 133 (2018) (citing *Wolf Child*, 699 F.3d at 1090 and 18 U.S.C. § 3583(d)(1), (2)) (internal

13   quotations omitted). The internet "is vital for a wide range of routine activities in today's world"

14   *United States v. LaCoste*, 821 F.3d 1187, 1191 (9th Cir. 2016). "Cutting off all access to the Internet

15   constrains a defendant's freedom in ways that make it difficult to participate fully in society and the

16   economy." *Id*.

17       Taken together, conditions 7 and 9 bar Mr. Nunez from possessing or using any electronic

18   device—including a computer, tablet, or cell phone—or accessing the internet for any purpose

19   whatsoever without the prior approval of his probation officer. He cannot, for example, use a

20   smartphone for non-internet related tasks, like placing a phone call or inputting his work schedule on a

21   calendar. Similarly, he cannot access the internet in ways we have all come to rely, such as looking up

22   the bus schedule, applying for a job, using Google Maps, listening to music, or reading the news.

23   Other random activities, such as purchasing a movie ticket at a kiosk or using a self-checkout line at

24   Target, which rely on internet services, would be prohibited unless Mr. Nunez obtained prior

25   approval—an unworkable arrangement. In addition, per condition 9, Mr. Nunez would have to tell his

26   employer that he cannot use any "on-line computer service." This would cause concern by the

27   employer and in fact, would hinder his current work that may require him to look up retail items on the

28   store's network.

Because of the prevalence of the internet in today's society, "courts have upheld conditions prohibiting all use of the Internet only in limited circumstances." *Id.*; *see also Packingham v. North Carolina*, 137 S. Ct. 1730, 1735–36 (2017) (explaining that the internet has become a quintessential forum for the exercise of First Amendment rights and striking down a statute prohibiting sex offenders from using social media). Even in cases involving child pornography or sex-offender offenses, courts have struck bans on the internet or computers. *United States v. Ellis*, 984 F.3d 1092, 1104 (4th Cir. 2021) (involving defendant convicted of failure to register as a sex offender and holding condition banning internet access was impermissibly overbroad); *United States v. Holena*, 906 F.3d 288, 292 (3d Cir. 2018) (holding computer, communication-devices, and internet ban overbroad even though use of the internet was integral to the defendant's offense of using the internet to try to entice a child into having sex); *United States v. Crume*, 422 F.3d 728, 733 (8th Cir. 2005) (holding bar on computer and internet access greater deprivation of defendant's First Amendment rights than was reasonably necessary for defendant convicted of child pornography offense); *United States v. Holm*, 326 F.3d 872, 877–78 (7th Cir. 2003) (condition barring defendant internet access impermissible even where convicted of child pornography offense); *United States v. Freeman*, 316 F.3d 386, 391–92 (3d Cir. 2003) (condition forbidding defendant convicted of child pornography offense computer in home or using internet service without approval of probation officer overly broad); *United States v. Sofsky*, 287 F.3d 122, 126–27 (2d Cir. 2002) (same). Although the challenged conditions allow for use of the internet or computer with the permission of a probation officer, allowing the defendant to obtain the approval of his probation officer cannot save an overbroad restriction and still creates an impractical procedure. *See Freeman*, 316 F.3d at 391–92; *LaCoste*, 821 F.3d at 1192; *Wolf Child*, 699 F.3d at 1095–96 & n.4.

At least one court in this district has recognized the overbreadth of the no computer and electronic device and no internet access conditions. *United States v. Carter*, 3:20-cr-253-VC, Dkt. 52, Order Revising Standard Conditions of Release Related to Computer and Internet Use for Child Pornography Offenders. Larouche Decl. ¶ 5, Ex. D. At a minimum, this Court should follow suit and similarly revise the conditions, along with the computer monitoring condition 8, to allow for monitored access to electronic devices and the internet.

**B. Proposed condition 13: No adult sexually explicit conduct condition as defined at 18 U.S.C. § 2256(2)**

The Ninth Circuit has held that the language in the condition restricting Mr. Nunez's access to materials depicting sexually explicit conduct as defined at 18 U.S.C. § 2256(2) is overbroad and restricts more liberty than is reasonably necessary to achieve the goals of supervised release. 18 U.S.C. § 3583(d)(2); *United States v. Gnirke*, 775 F.3d 1155, 1163 (9th Cir. 2015); *Cf. United States v. Rearden*, 349 F.3d 608, 612, 620 (9th Cir. 2003) (defendant's conduct included sending vile and violent pornographic images of adult men and infants and young children and he collaborated with a dangerous pedophile). *Gnirke* held that in light of the significant First Amendment right to access free speech at issue, the condition infringed on more liberty than reasonably necessary. *Id.* "By employing the language from a statute [18 U.S.C. § 2256(2)] intended to apply only to child pornography, the plain language of [Mr. Nunez]'s condition includes any depiction of actual or simulated adult sexual intercourse, however fleeting or veiled, and regardless of how insignificant it may be to the overall content of an art exhibit, play, or movie." *Id.* "Applied literally, the language of the condition would prevent [Mr. Nunez] from viewing Oscar-winning films like *American Beauty* and *Brokeback Mountain*, television shows like *The Wire*, or sexually explicit works of art that appear in museums; yet such non-pornographic materials receive full protection under the First Amendment." *Id.* at 1165. Although the condition in *Gnirke* was broader in that it restricted the defendant's ability to patronize a location where sexually explicit materials were available, still here the condition is overbroad given its vast restriction to First Amendment material where there is no support that such a broad ban on Mr. Nunez's access, fleeting or otherwise, to adult sexually explicit conduct, would lead to reoffending or other concerns for public safety. Further because of the definition in § 2256(2) "extends well beyond possession of what is commonly understood as 'pornography' . . . [it] makes it much more likely that [Mr. Nunez] will unwittingly violate the condition." *Id.* The government does not meet its burden to show the necessity of the condition and it should be stricken.

### C. Proposed condition 14: Ban from 100 feet of any location where children are likely to gather or contact with children

Proposed condition 14 should be stricken because it is overbroad and it infringes upon Mr. Nunez's First Amendment rights and liberty more than is reasonably necessary to achieve the goals of supervision. 18 U.S.C. § 3583(d)(2); *see Wolf Child*, 699 F.3d at 1100–01. The First Amendment protects an individual's right to freely associate with others. *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987); *Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539, 543-44 (1963). Individuals on supervised release maintain this right, as balanced against the goals of supervision. *See, e.g.*, *United States v. Soltero*, 510 F.3d 858, 867 (9th Cir. 2007) (restriction on defendant's association with any known member of a "disruptive group" violated his First Amendment right to freely associate).

Within the sex offense context, courts must look to the facts underlying the particular conviction and determine whether in-person contact with minors contributed to the offense or whether future contact would increase the risk of recidivism. *Compare United States v. Del Valle-Cruz*, 785 F.3d 48, 59–64 (1st Cir. 2015) (invalidating conditions related to personal contact and residing with minors for defendant convicted of failure to register as a sex offender because no evidence he posed future risk of abusing the minors) *with United States v. Mercado*, 777 F.3d 532, 538–39 (1st Cir. 2015) (upholding similar conditions for defendant convicted of same offense because the conditions "draw heavily on the defendant's history and characteristics and are buttressed by case-specific reasons," including the defendant's prior conviction for sexually assaulting a minor).

Here, the condition would restrict Mr. Nunez from exercising core associational freedom with his family, specifically his two nieces and two nephews. *See Wolf Child*, 699 F.3d at 1092 (holding fundamental right to familial association is a particularly significant liberty interest). Mr. Nunez would not be able to babysit his sisters' children or help with the kids at any family functions without prior approval. The infringement on his familial relations is not justified by the record here where Mr. Nunez has not had illegal contact with young children or his family members. *See id*. at 1092, 1099 (holding that district court's explanation that the defendant could not be trusted with minor children was insufficient to establish why he posed a danger to his children even when in the instant case

defendant attempted to engage in sexual relations with sixteen year old girl who had passed out and had prior relationships with teenagers).

In addition, because he would be restricted from going within 100 feet of any location "where children are *likely* to gather," he would be banned from common spaces like Golden Gate Park, Ocean Beach, and shopping malls where families regularly gather. Such a broad condition is not reasonably related nor sufficiently narrow for the goals of deterrence and protection of the public given Mr. Nunez's specific circumstances and offense. This Court should strike the condition or, at a minimum, narrow it.

### D.  Proposed condition 22: Abstain from use of alcoholic beverages

The condition restricting Mr. Nunez's use of any alcohol is overbroad and violates § 3583(d). Although Mr. Nunez was drinking alcohol and using cocaine at the time of the offense, that was over three years ago. On pretrial release for over two years, his use of alcohol was not restricted and he had no violations. Importantly here, Mr. Nunez's work at Total Wine and More requires him to sometimes have "tasters" so he can appropriately market and sell wine and spirits. Accordingly, this condition infringes on more of Mr. Nunez's liberty than is necessary and would hamper his current employment. The Court should strike this condition or, at a minimum, revise it to state Mr. Nunez cannot have alcohol to excess.

### CONCLUSION

For the foregoing reasons, Mr. Nunez respectfully requests that the Court impose a sentence of five years' probation and a lengthy period of supervised release with restrictive conditions.

February 22, 2023
Dated

JODI LINKER
Federal Public Defender
Northern District of California

/S
ELISSE LAROUCHE
Assistant Federal Public Defender